IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENN-MONT BENEFIT SERVICES,** : | | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | No. 13-4130 |
| Defendant. | : | |

**M E M O R A N D U M**

**Stengel, J.**                                                                                                       **August 20, 2015**

Penn-Mont Benefit Services is the administrator of the Regional Employers Assurance Leagues Voluntary Employees' Benefit Association (REAL VEBA) trust, which the IRS determined was a tax shelter. In November 2012, the IRS assessed 26 U.S.C. § 6700 penalties against Penn-Mont and John Koresko, the REAL VEBA creator and primary officer of Penn-Mont, for their respective roles in promoting the REAL VEBA plan in 2003. After paying the portion of the assessment required by statute, Mr. Koresko and Penn-Mont sued the United States in two separate actions for a refund of the penalty assessment they paid—asserting that it was unwarranted, incorrect, or impermissible under several legal theories.

The United States filed a counterclaim, requesting the penalties be paid in full. The Government asserts six counts or reasons why the REAL VEBA scheme was not a legally permissible tax exemption vehicle. Penn-Mont failed to answer the Government's counterclaim. The Clerk of Court entered default at the Government's request. The

1

United States has moved for default judgment. For the reasons explained below, I will grant this motion in part and deny it in part.

## I. Procedural History of this Action

On or about November 19, 2012, pursuant to 26 U.S.C. § 6700, the IRS issued a Notice of Penalty Charge to Penn-Mont assessing a penalty of $386,000 under 26 U.S.C. § 6700 for promoting an abusive tax shelter in taxable year 2003.[1] On December 17, 2012, Penn-Mont paid $57,900 or 15% of the penalty and filed a Claim for Refund of Tax Return Preparer and Promoter Penalties.[2] On July 16, 2013, Penn-Mont filed this action seeking a tax refund under 26 U.S.C. § 6703(c)(2).[3] It claims the civil penalty is erroneous for several reasons: it cannot be considered a "promoter" within the meaning of the statute; it lacked the requisite intent of knowing that its statements were false; and the calculation of penalties is incorrect.[4] Penn-Mont seeks declaratory judgment that it is not liable for these penalties, a refund with interest of the 15% already paid, attorney's fees and costs.[5]

---

[1] See Compl., Doc. No. 1 at ¶ 6.

[2] See Compl., Doc. No. 1 at ¶¶ 7, 8, Ex. A, B.

[3] "Under section 6703 of the Code, the taxpayer can litigate the merits of the penalties in district court if the taxpayer (1) pays fifteen percent of the penalties, (2) files for a refund, and (3) is refused the refund claim (or six months passes from the date the taxpayer files)." Hankin v. U.S., 891 F.2d 480, 481 (3d Cir. 1989). The IRS will not collect the remainder of the assessment during the pendency of the proceedings. Id. (citing 26 U.S.C. § 6703 (1982)). Penn-Mont has not indicated that he received a denial of his refund, so it appears this suit is timely. The Government does not raise any time-bar argument.

[4] Compl., Doc. No. 1 at ¶ 10.

[5] Compl., Doc. No. 1 at 4.

The Government answered Penn-Mont's complaint and asserted a counterclaim comprised of seven distinct violations of § 6700.[6] According to the counterclaim, the REAL VEBA arrangement was an "abusive tax shelter."[7] The REAL VEBA allowed business owners to purchase expensive, cash-value life insurance for themselves without treating that benefit as taxable income. Contributions to the REAL VEBA were then deducted from the businesses' taxable income and treated as a "business expense." The Government claims, in the alternative, that even if the business owners were not aware that this arrangement was an "abusive tax shelter," Penn-Mont led them to believe it was lawful as a way to defraud them. Either way, the Government claims that Penn-Mont, through its officers and agents, made statements about the lawful nature of the REAL VEBA which they knew or should have known were false or fraudulent. Under § 6700, the Government argues Penn-Mont would be liable for civil penalties.[8]

Penn-Mont did not respond to the Government's counterclaim.[9] The Government requested that the Clerk of Court enter default on May 16, 2014. After default was entered, the Government moved for default judgment on its counterclaim.

---

[6] The Government asserts the following seven Counts as violations of § 6700: 1) Count I: The REAL VEBA was not a Voluntary Employees' Beneficiary Association: 2) Count II: The REAL VEBA was not a single plan; 3) Count III: The REAL VEBA scheme discriminated among participants; 4) Count IV: The REAL VEBA scheme was a deferred compensation plan; 5) Count V: The Real VEBA scheme did not provide a fixed welfare benefit for a fixed coverage period; 6) Count VI: The REAL VEBA scheme used non-standard triggers for paying benefits; and 7) Count VII: The operations and earnings of the REAL VEBA scheme inured to the benefit of John Koresko.

[7] See Doc. No. 21 (Government's counterclaim).

[8] The Government previously moved to strike paragraph 10(e) of the plaintiff's complaint, which asserted a defense of laches. Doc. No. 10. I granted that motion. Doc. No. 12.

[9] The original complaint was filed by Mr. Koresko, a trained attorney, on behalf of Penn-Mont. On December 19, 2013, the Supreme Court of Pennsylvania temporarily suspended Mr. Koresko from practicing law, after a disciplinary proceeding. See In the Matter of: John J. Koresko, V, No. 13–mc–294 (E.D. Pa. Dec. 27, 2013)(Doc. No. 1).

3

## II. Default Judgment Standard

Federal Rule of Civil Procedure 55(b)(2) provides that a district court may enter default judgment against a party when default has been entered by the Clerk of Court. FED. R. CIV. P. 55(b)(2). Entry of a default judgment is within the court's discretion and is not automatic in the instance of "a defendant's failure to respond to the complaint." D'Onofrio v. Il Mattino, 430 F. Supp. 2d 431, 437 (E.D. Pa. 2006)(citing Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005)); Hritz v. Woma Corp., 732 F.2d 1178, 1180 (3d

---

On July 18, 2013, Post & Schell entered an appearance on behalf of Penn-Mont. Doc. No. 4. Two other attorneys from Florida also entered an appearance later in July. Doc. No. 6 and 8. On March 28, 2014, Penn-Mont's attorneys moved to withdraw as counsel, to which Penn-Mont consented. See Doc. No. 20. I granted this motion. Penn-Mont was aware that it needed to secure a new attorney as of March 27, 2014. See 14-cv-1484-MAM, Doc. No. 11. Penn-Mont was also required to file an application to retain new counsel with Judge McLaughlin, who was handling Penn-Mont's bankruptcy action, before proceeding in this case. See 14-cv-1484, Doc. No. 12 ("[T]he debtor shall file an application under Sections 327-329 of title 11 U.S.C. with this Court to retain said counsel and/or other professional persons which may be responded to by interested parties and shall be determined by this Court upon notice and after opportunity to be heard; and in particular Penn-Mont shall make application as aforesaid to retain counsel before proceeding in pursuing litigation pending in the matter of Penn-Mont Benefit Services v. United States, 13-cv-4130-LS (E.D. Pa. July 16, 2013)."). No such application was ever filed. Mr. Koresko, as an officer of Penn-Mont, sent this court a letter dated April 4, 2014 that he was in the process of securing new counsel for Penn-Mont.

Despite all this, Penn-Mont never secured a new attorney, never put in an application to Judge McLaughlin regarding a new attorney appointment, never properly asked for an extension to respond to the counterclaim, and never answered the counterclaim. In addition, Penn-Mont has failed to prosecute its bankruptcy case before Judge McLaughlin. See 14-cv-1487, Doc. No. 32, 33. Penn-Mont was well aware that the Government planned to file a counterclaim in this case before the counter claim was filed. See Doc. No. 19. See also See In re: Penn-Mont Benefit Services, Inc., 14-cv-1487-MAM, Doc. No. 12.

Mr. Koresko was not permitted to respond on Penn-Mont's behalf. On June 17, 2014, Chief Judge Tucker ordered that Mr. Koresko be placed on temporary suspension from practice in the Eastern District of Pennsylvania, pending further definitive disciplinary action by the Supreme Court of Pennsylvania. Order, In the Matter of: John J. Koresko, V, No. 13–mc–294 (E.D. Pa. June 17, 2014)(Doc. No. 37). Mr. Koresko has also appealed this suspension. See In re: John J. Koresko, V, No. 14–3393 (3d Cir. filed July 29, 2014). The Third Circuit is currently considering whether Mr. Koresko will be suspended from practicing in that court. See In re: John Koresko, No. 14–8085 (3d Cir. filed June 20, 2014).

On June 18, 2014, Judge McLaughlin also issued an Order in Perez v. Koresko, et al. stating that Mr. Koresko could only continue to represent himself *pro se*; he could not act as counsel for any other individuals or entities, including Penn-Mont. Perez v. Koresko, et al., 09-988, Doc. No. 871. Judge McLaughlin gave Penn-Mont thirty days to retain new counsel in her case. No new counsel ever entered an appearance on behalf of Penn-Mont in that case either. See Perez v. Koresko, et al., 09-988, ---F.Supp.3d---, 2015 WL 505471, at *12 n. 24 (E.D. Pa. Feb. 6, 2015).

4

Cir. 1984)). Judgment by default is generally disfavored in the interest of deciding a case on its merits. Budget Blinds, Inc. v. White, 536 F.3d 244, 258 (3d Cir. 2008); United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 194–95 (3d Cir. 1984). "[T]he factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990).[10]

### III. Findings of Fact[11]

"Voluntary employees' beneficiary associations" (VEBAs) are a type of tax entity that enables businesses to provide welfare benefits, such as death benefits, to their employees while deducting the cost of the employers' welfare benefit plan from the business's income.[12] Deductions for employers' contributions to VEBA welfare benefit plans are governed by several provisions of the Internal Revenue Code and Treasury Regulations, including I.R.C. §§ 501(c)(9) and 419A.[13] VEBAs that purport to operate under an exception carved into I.R.C. § 419A(f)(6) are referred to as 'ten or more

---

[10] See also DIRECTV Inc. v. Pepe, 431 F.3d 162, 165 (3d Cir. 2005)("It noted that while the factual allegations in a complaint, other than those as to damages, are treated as conceded by the defendant for purposes of a default judgment, legal issues remain subject to its adjudication.") and id. at 165 n. 6 (quoting Comdyne); Rainey v. Diamond State Port Corp., No. 09–2003, 354 Fed.Appx. 722, 724 (3d Cir. Dec. 7, 2009)("Rather, defaults are treated as admissions of the facts alleged, but a plaintiff may still be required to prove that he or she is entitled to the damages sought.").

[11] For more information about how the REAL VEBA was structured and administered, see Perez v. Koresko, et al., --- F.Supp.3d ----, No. 09–988, 2015 WL 505471, at *13-67 (E.D. Pa. Feb. 6, 2015), and Koresko v. United States, 13-4131, Doc. No. 76 (motion for summary judgment).

[12] I.R.C. § 501(c)(9). See also Neonatology Assocs., P.A. v. Comm'r, 299 F.3d 221, 224-25 (3d Cir. 2002) (explaining VEBA arrangements and their attendant requirements).

[13] See I.R.C. §§ 419, 419A, and 501(c)(9); 26 C.F.R. § 1.419A(f)(6)-1(c).

employer' (TOME) plans.[14] If a VEBA plan does not comply with the provisions of the Internal Revenue Code and Treasury Regulations, then the IRS may disallow an employer's deduction for contributions to the VEBA arrangement and the IRS may also treat the benefits paid from the plan as taxable income to beneficiaries.[15]

The REAL VEBA arrangement at issue was originally adopted on March 20, 1995 as a multiple employer VEBA, following consolidation of certain trusts originally known as the Delaware Valley Leagues.[16] John Koresko created the REAL VEBA arrangement.[17] One of the primary purposes for the REAL VEBA arrangement was to generate large tax deductions for employer participants.[18] The REAL VEBA Trust was "a tax-driven 'multiple employer trust' (MET) that was designed and intended from its inception as an entrepreneurial venture offering a tax-favored funding vehicle for participating employers who sought to maximize the deductibility of their cost for welfare benefits for themselves and their employees."[19] The REAL VEBA arrangement purported to operate as a voluntary employees' beneficiary association under I.R.C. § 501(c)(9) and as a TOME plan under I.R.C. § 419A(f)(6).[20]

---

[14] Neonatology Assocs., 299 F.3d at 226.

[15] See generally Neonatology Assocs., 299 F.3d 221.

[16] Doc. No. 21 (Counterclaim) at ¶ 15.

[17] Doc. No. 21 (Counterclaim) at ¶ 15.

[18] Doc. No. 21 (Counterclaim) at ¶ 19.

[19] Doc. No. 21 (Counterclaim) at ¶ 20.

[20] Doc. No. 21 (Counterclaim) at ¶ 16.

6

The REAL VEBA arrangement operated through four interconnected documents (collectively, "the REAL VEBA documents"):[21]

a. The Master Trust Agreement between the REAL, Settlor, and Community Trust Company, Trustee, originally adopted March 20, 1995, amended and restated March 18, 2002 (Master Trust Agreement);

b. The REAL [Formerly: The Delaware Valley Leagues] VEBA Health and Welfare Benefit Plan Document- Sponsored by: Penn-Mont Benefit Services, Inc. (Plan Document);

c. The REAL VEBA Health and Welfare Benefit Plan Adoption Agreement- Sponsored by: Penn-Mont Benefit Services, Inc. (Adoption Agreement); and

d. The Participation Agreement and Limited Power of Attorney executed by each participant (Participation Agreement).

The provisions of the Plan Documents are all incorporated by reference into the Master Trust Agreement.[22] Read together, the REAL VEBA documents describe several interacting elements within the REAL VEBA arrangement, including: (i) a League, (ii) a Trust, (iii) a Trustee, (iv) an Administrator, (v) counsel, (vi) a plan, (vii) a VEBA, and (viii) a Committee.[23]

---

[21] Doc. No. 21 (Counterclaim) at ¶ 27, 27a-27d.

[22] Doc. No. 21 (Counterclaim) at ¶ 29.

[23] Doc. No. 21 (Counterclaim) at ¶ 30.

### Penn-Mont administered the REAL VEBA arrangement

Penn-Mont is a Pennsylvania corporation formed by John Koresko. The REAL VEBA documents name Penn-Mont as the Administrator for the REAL VEBA arrangement.[24] As the Administrator, Penn-Mont had the sole power to amend the Master Trust Agreement and Plan Documents.[25] Penn-Mont was also named as Administrator in the pre-printed portion of Section 2c of the Adoption Agreement that every employer participant executed.[26] Neither employer participants nor employee participants enjoyed the right to appoint another administrator for the REAL VEBA arrangement.[27] Since 1995, the Trustee of the REAL VEBA arrangement served as a "directed" trustee of the REAL VEBA Trust.[28] As such, the Trustee was subject to the direction of Penn-Mont in all material respects.[29] Thus, Penn-Mont, through its officers and agents, controlled the operations of REAL VEBA Trust, and all of the assets owned by the Trust.[30]

### Penn-Mont promoted the REAL VEBA arrangement

Penn-Mont advertised the REAL VEBA arrangement on its website and through its officers and agents.[31] Penn-Mont's website claimed that VEBAs have several

---

[24] Doc. No. 21 (Counterclaim) at ¶ 39.

[25] Doc. No. 21 (Counterclaim) at ¶ 40.

[26] Doc. No. 21 (Counterclaim) at ¶ 41.

[27] Doc. No. 21 (Counterclaim) at ¶ 41.

[28] Doc. No. 21 (Counterclaim) at ¶ 65.

[29] Doc. No. 21 (Counterclaim) at ¶ 65.

[30] Doc. No. 21 (Counterclaim) at ¶ 67.

[31] Doc. No. 21 (Counterclaim) at ¶ 74.

advantages, including tax deductions, and security of plan assets with independent corporate trustees and insurance companies.[32] On its website, Penn-Mont advertised that it was "a nationally recognized employee benefits firm that offers turnkey design, installation and administration of qualified retirement plans and other welfare benefit trusts. In addition, Penn-Mont offered consulting and educational services to professional and closely held corporations and their financial planners, legal advisors and accountants."[33]

Penn-Mont marketed the REAL VEBA arrangement throughout the country via the internet and other means such as postcards, brochures, and seminars.[34] Penn-Mont promoted the REAL VEBA arrangement directly through seminars presented by Koresko.[35] Penn-Mont advertised that its goal was "to provide insurance agents, financial planners, attorneys and accountants with a working knowledge of cutting edge legal developments in the area of employee welfare benefits, including the design, installation and maintenance of an employee welfare benefit plan as funded through life insurance; the fundamentals of estate planning; and issues governing corporate taxation."[36]

### Penn-Mont made or furnished statements regarding the deductibility of contributions to the REAL VEBA arrangement

Penn-Mont, through its officers and agents, made statements regarding the

---

[32] Doc. No. 21 (Counterclaim) at ¶ 80.

[33] Doc. No. 21 (Counterclaim) at ¶ 81.

[34] Doc. No. 21 (Counterclaim) at ¶ 80.

[35] Doc. No. 21 (Counterclaim) at ¶ 74.

[36] Doc. No. 21 (Counterclaim) at ¶ 83.

deductibility of employer contributions to the REAL VEBA arrangement in conjunction with organizing and promoting the scheme.[37] Penn-Mont, through its officers and agents, made statements regarding the REAL VEBA plan's qualification for tax benefits as an I.R.C. § 501(c)(9) organization.[38] Specifically, Penn-Mont, through its officers and agents, claimed in the REAL VEBA documents, summary plan documents, promotional materials, seminars, and opinion letters that the REAL VEBA arrangement employed a valid voluntary employees' benefit association.[39]

Penn-Mont also made statements, through its officers and agents, regarding the REAL VEBA plan's qualification as a TOME plan for tax benefits under I.R.C. § 416A(F)(6).[40] Specifically, Penn-Mont, through its officers and agents, claimed in the REAL VEBA documents, summary plan documents, promotional materials, seminars, and opinion letters that the REAL VEBA arrangement qualified a valid TOME plan.[41]

**Penn-Mont knew or should have known that its claim that the REAL VEBA arrangement was a qualified VEBA under I.R.C. § 501(c)(9) was false**

To qualify for tax benefits as an I.R.C. § 501(c)(9) organization, a VEBA must have a membership composed of members that have an employment-related common bond. Treas. Reg. § 1.501(c)(9)-2(a)(l).[42] Employer participants in the REAL VEBA

---

[37] Doc. No. 21 (Counterclaim) at ¶ 85.

[38] Doc. No. 21 (Counterclaim) at ¶ 86.

[39] Doc. No. 21 (Counterclaim) at ¶ 87.

[40] Doc. No. 21 (Counterclaim) at ¶ 88.

[41] Doc. No. 21 (Counterclaim) at ¶ 89.

[42] Doc. No. 21 (Counterclaim) at ¶ 90.

arrangement did not share any employment-related common bond.[43] Further, to qualify for tax benefits as an I.R.C. § 501(c)(9) organization, a VEBA must also meet the nondiscrimination requirements of I.R.C. § 505(b).[44] In practice, however, the REAL VEBA arrangement discriminated among owner-employee participants and non-owner employee participants.[45]

Finally, to qualify for tax benefits as an I.R.C. § 501(c)(9) organization, a VEBA must provide qualifying employee welfare benefits. Treas. Reg. § 1.50l(c)(9)-3(a).[46] The REAL VEBA arrangement was merely a thinly-veiled deferred compensation plan that enabled owners of a business to avoid or defer payment of federal income tax.[47]

### Penn-Mont knew or should have known that its claim that the REAL VEBA arrangement was a valid TOME plan under I.R.C. § 419A(f)(6) was false

To qualify for tax benefits as an I.R.C. § 419A(f)(6) Ten-Or-More-Employers (TOME) plan, an arrangement must operate as a *single* welfare benefit plan. Treas. Reg. § 1.419A(f)(6)-1(a)(1).[48] The REAL VEBA arrangement did not operate as a single plan, but as a collection of individual employer's welfare benefit plans.[49] Similarly, an arrangement is specifically disqualified as a TOME plan if the plan assets are separately

---

[43] Doc. No. 21 (Counterclaim) at ¶¶ 90-100.

[44] Doc. No. 21 (Counterclaim) at ¶ 128.

[45] Doc. No. 21 (Counterclaim) at ¶¶ 128-36.

[46] Doc. No. 21 (Counterclaim) at ¶ 137.

[47] Doc. No. 21 (Counterclaim) at ¶¶ 137-42.

[48] Doc. No. 21 (Counterclaim) at ¶ 101.

[49] Doc. No. 21 (Counterclaim) at ¶¶ 101-27.

accounted for among employers. Treas. Reg. § 1.419A(f)(6)-1(c).[50] However, the REAL VEBA arrangement separately accounted for assets among employer participants.[51]

Furthermore, an arrangement is specifically disqualified as a TOME plan if the plan fails to provide for a fixed welfare benefit, for a fixed coverage period, for a fixed price. Treas. Reg. § 1.419A(f)(6)-1(c).[52] Under Penn-Mont's control, the REAL VEBA arrangement did not provide a "fixed" welfare benefit and did not provide a "fixed" coverage period.[53] Finally, an arrangement is specifically disqualified as a TOME plan if the plan uses nonstandard triggers for paying benefits or other amounts from the plan. Treas. Reg. § 1.419A(f)(6)-1(c).[54] However, the trigger for payment of benefits within the REAL VEBA arrangement was not the death of a participant, but the determination that the claim was "valid" by Penn-Mont.[55]

### IRS assessment of penalties

On November 19, 2012, a delegate of the Secretary assessed penalties against Penn-Mont under I.R.C. § 6700 for making and furnishing false statements about the tax benefits of the REAL VEBA arrangement in conjunction with Penn-Mont's role in organizing the arrangement in tax year 2003.[56] The Government claims that Penn-Mont is

---

[50] Doc. No. 21 (Counterclaim) at ¶ 102.

[51] Doc. No. 21 (Counterclaim) at ¶¶ 102, 109-19.

[52] Doc. No. 21 (Counterclaim) at ¶ 143.

[53] Doc. No. 21 (Counterclaim) at ¶¶ 143-55.

[54] Doc. No. 21 (Counterclaim) at ¶ 155.

[55] Doc. No. 21 (Counterclaim) at ¶¶ 155-58.

[56] Doc. No. 21 (Counterclaim) at ¶¶ 59-62.

liable for the unpaid balance of those penalties in the amount of $344,406.46, plus interest as of June 27, 2014.[57]

## IV. DISCUSSION[58]

### a. Liability Under § 6700

To establish a violation of section 6700(a)(2)(A), the Government must prove four elements about Penn-Mont: 1) it organized or participated in the sale of certain investment plans or arrangements; 2) it made statements about the allowability of deductions or tax credits, excludability of income, or securing of other tax benefits; 3) it knew or had reason to know the statements were false; and 4) the statements pertain to a material matter. See U.S. v. Stover, 650 F.3d 1099, 1107 (8th Cir. 2011); United States v. Benson, 561 F.3d 718, 721-22 (7th Cir. 2009), *cert. denied*, 130 S.Ct. 759 (2009); United States v. Gleason, 432 F.3d 678, 682 (6th Cir. 2005); United States v. Estate Pres. Servs., 202 F.3d 1093, 1098 (9th Cir. 2000); U.S. v. Campbell, 897 F.2d 1317, 1320 (5th Cir. 1990).

The Government specifically argues that Penn-Mont, by and through its agents and officers, made false statements pertaining to REAL VEBA's status as a VEBA and a TOME. These statements, the Government contends, contradict what is required by the Code to allow a VEBA to be a TOME. Therefore, Penn-Mont's presentation of the REAL

---

[57] Doc. No. 27, Ex. A.

[58] This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346(a), and 26 U.S.C. §§ 6703(c) and 7422. Venue is proper pursuant to 28 U.S.C. §§ 1396 and 1402.

VEBA as a TOME, which allowed for certain tax-advantages to employers, brought it within the purview of § 6700(a) penalties.

In order to qualify as a VEBA, several requirements must be met. A VEBA must be separate from a participating employer and its employees' membership must be voluntary. 26 C.F.R. § 1.501(c)(9)–1, 2. Members of VEBAs must share "an employment –related common bond"—i.e. they all have the same employer, belong to the same trade union, or do the same type of work in the same geographic area. 26 C.F.R. § 1.501(c)(9)–1, 2, Treas. Reg. § 1.501(c)(9)–1, 2(a)(1). Deferred compensation benefits such as pension annuities or profit sharing are not permissible benefits which a VEBA could provide. See Booth v. Commissioner, 108 T.C. 524, 562-64 (1997). Benefits provided by a VEBA shall not be "discriminatory," meaning they shall not favor "highly compensated individuals."[59] 26 U.S.C. § 505(a), (b)(effective Jan. 1, 2002). No part of the net earnings of the VEBA can inure to the benefit of a private shareholder or individual except through the payment of benefits to VEBA participants. 26 C.F.R. § 1.501(c)(9)–4, Treas. Reg. § 1.501(c)(9)–4.[60]

Section 1.419A(f)(6)–1 (c) outlines the characteristics which "generally indicates that the plan is not a 10 or more employer plan [TOME] described in section 419A(f)(6)." These characteristics include: "separate accounting of contributions and expenditures for individual employers, or otherwise"; "[d]ifferential pricing" for participating employers,

---

[59] "Highly compensated individuals" include owners with a more than 5 percent stake in a company or who makes over $80,000 in the previous year and was in the top paid group of employees. 26 U.S.C. § 414(q).

[60] See also In re: REAL VEBA Trust, No. 13–ap-16440, Doc. No. 1 (Koresko's Verified Complaint; Ex. 1 to the United States' motion), at 6 (describing the necessary characteristics of a VEBA from Mr. Koresko's verified complaint).

14

"not merely reflective of differences in current risk or rating factors that are commonly taken into account in manual rates used by insurers…"; "not provid[ing] for fixed welfare benefits for a fixed coverage period for a fixed cost…"; and having "[n]onstandard benefit triggers" which allow benefits to be paid "by reason of any event other than the illness, personal injury, or death of an employee or family member, or the employee's involuntary separation from employment." 26 C.F.R. § 1.419A(f)(6)–1, Treas. Reg. § 1.419A(f)(6)–1 (c)(2), (3), (4) and (6). "[U]nless established to the satisfaction of the Commissioner that the plan satisfies the requirements of section 419A(f)(6) and this section," a plan having any of the outlined characteristics is not considered to be a TOME. 26 C.F.R. § 1.419A(f)(6)–1 (c).

The allegations of the United States' counterclaim establish that Penn-Mont is liable for penalties under § 6700 for tax year 2003. Penn-Mont organized and promoted the REAL VEBA arrangement.[61] Penn-Mont made or furnished statements about the tax benefits of participating in the REAL VEBA arrangement.[62] Specifically, Penn-Mont claimed that the REAL VEBA arrangement qualified as a valid VEBA under I.R.C. § 501(c)(9) and operated as a valid TOME plan under I.R.C. § 416A(f)(6).[63]

The facts alleged in the United States' counterclaim demonstrate that Penn-Mont knew or should have known that its statements regarding the tax benefits of participating in the REAL VEBA arrangement were false or fraudulent. Penn-Mont knew or should

---

[61] Doc. No. 21 (Counterclaim) at ¶¶ 54-84.

[62] Doc. No. 21 (Counterclaim) at ¶¶ 85-89.

[63] Doc. No. 21 (Counterclaim) at ¶¶ 86-89.

have known that its claim that the REAL VEBA arrangement qualified as a valid VEBA under I.R.C. § 501(c)(9) was false because:

(i) employer participants in the REAL VEBA arrangement did not share any employment-related common bond;[64]

(ii) the REAL VEBA arrangement discriminated among owner employee participants and non-owner employee participants;[65]

(iii) the REAL VEBA arrangement was a thinly-veiled deferred compensation plan that enabled owners of a business to avoid or defer payment of federal income tax.[66]

Penn-Mont also knew or should have known that its claim that the REAL VEBA arrangement qualified as a valid TOME plan under I.R.C. § 419A(f)(6) was false because:

(i) the REAL VEBA arrangement did not operation as a single plan, but as a collection of individual employers' welfare benefit plans;[67]

(ii) the REAL VEBA arrangement separately accounted for assets among employer participants;[68]

(iii) the REAL VEBA arrangement did not provide a "fixed" welfare benefit and did not provide a "fixed" coverage period;[69] and

(iv) the trigger for payment of benefits within the REAL VEBA arrangement was not the death of a participant, but the determination that the claim was "valid" by Penn-Mont.[70]

---

[64] Doc. No. 21 (Counterclaim) at ¶¶ 90-100.

[65] Doc. No. 21 (Counterclaim) at ¶¶ 128-36.

[66] Doc. No. 21 (Counterclaim) at ¶¶ 137-42.

[67] Doc. No. 21 (Counterclaim) at ¶¶ 101-27.

[68] Doc. No. 21 (Counterclaim) at ¶¶ 102, 109-119.

[69] Doc. No. 21 (Counterclaim) at ¶¶ 143-55.

Taking the factual allegations provided by the Government as admitted and true, I find that the elements of § 6700 liability are met. I will enter judgment in favor of the Government on this point.

### b. Assessment of Penalties

The Government has also moved for me to enter judgment regarding the amount of the penalties assessed. To support this assessment, the Government offers a declaration of Revenue Officer Ted Tsarouchis and the certified IRS Form 4340 (Certificate of Assessment) for tax year 2003. The Government determined that those penalties to be in the amount of $344,406.46, plus interest. Yet, the Government has provided no other documentation to show how this amount was calculated. While I am obliged to consider all factual allegations as admitted, I am not required to take the amount of damages put forth by a movant to be true. See Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990)("[T]he factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."); DIRECTV Inc. v. Pepe, 431 F.3d 162, 165 (3d Cir. 2005)("It noted that while the factual allegations in a complaint, other than those as to damages, are treated as conceded by the defendant for purposes of a default judgment, legal issues remain subject to its adjudication.") and id. at and 165 n. 6 (quoting Comdyne); Rainey v. Diamond State Port Corp., No. 09–2003, 354 Fed.Appx. 722, 724 (3d Cir. Dec. 7, 2009)("Rather, defaults are treated as admissions of the facts alleged, but a plaintiff may still be required to prove that he or she is entitled to the damages sought.").

---

[70] Doc. No. 21 (Counterclaim) at ¶¶ 155-58.

Under § 6700(a)(2)(B), the promoter "shall pay, with respect to each activity described in paragraph (1), a penalty equal to the $1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity." Presumably, the Government has made the amount of tax penalty based on over three hundred different false statements made by Penn-Mont, through its agents and officers. The IRS has not put forth evidence or an explanation of how it has calculated the $344,406.46 penalty against Penn-Mont.[71]

While default judgment establishes that the defaulting party is liable for the allegations in the complaint, it does not establish the amount of damages owed by the defendant. Bricklayers & Allied Craftworkers v. WaterControl Servs., Inc., No. 09–3935, 2012 WL 3104437, at *7 (E.D. Pa. July 30, 2012). "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Id. (quoting Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155

---

[71] The Government argues in a footnote that the certified copy of IRS Form 4340 is self-authenticating under Fed. R. Evid. 902(1). See United States v. Updegrave, 1997 U.S. Dist. LEXIS 7536, n. 8 (E.D. Pa. 1997); Hess v. Internal Revenue Service, 1992 U.S. Dist. LEXIS 7201 (E.D. Pa. Apr. 10, 1992).

Because the IRS's determination that a tax is owed is presumed correct, the United States can establish a *prima facie* case of the tax liability charged by introducing into evidence certified copies of the certificates of tax assessment. U.S. v. Stuler, No. 10–2211, 396 Fed.Appx. 798, 801 (3d Cir. 2010)(citing United States v. Sarubin, 507 F.3d 811, 816 (4th Cir. 2007)). Typically, the burden then shifts to the taxpayer to prove a tax assessment is incorrect after a *prima facie* case has been made. See Francisco v. United States, 267 F.3d 303, 319 (3d Cir. 2001); Welch v. Helvering, 290 U.S. 111, 115 (1933); Sullivan v. United States, 618 F.2d 1001, 1009 (3d Cir.1980); Psaty v. United States, 442 F.2d 1154, 1159 (3d Cir. 1971).

However, the statute specifically states that the burden of proof regarding penalties assessed under § 6700 remains on the Government. See § 6703(a). This, of course, makes sense because these penalties, unlike other tax assessments, are strictly punitive and do not relate to taxes owed. See Neder v. U.S., 527 U.S. 1, 23 n. 7 (1999)(described as "criminalizing the making of a statement regarding investment tax benefits that an individual 'knows or has reason to kno[w] is false or fraudulent as to any material matter'"). If the Government disagrees with my assessment of this issue, the Government can address legal arguments about the burden of proof required under § 6700 in this Circuit in its motion regarding damage calculation. From what the Government has provided, I am not convinced that a simple presentation of the IRS form and agent's affidavit is enough to make its case regarding calculation of penalties under § 6700(a)(2)(B). See Cook v. U.S., 46 Fed.Cl. 110, 113-15 (2000)(explaining how the presumption of correctness does not apply to "naked" assessments).

(2d Cir. 1999)). Without more information, I cannot find "with reasonable certainty" that the Government is entitled to the amount it has calculated.

I am also hesitant to enter judgment on the amount of the penalty given that this calculation is based on actions taken by Penn-Mont's officers, including Mr. Koresko. See FED. R. CIV. P. 55(b)(2). The Government made a separate § 6700 penalty assessment against Mr. Koresko, himself, based on similar allegations about the REAL VEBA. If the Government assessed penalties against both Koresko and Penn-Mont based on actions taken by Koresko, there is a chance that Mr. Koresko may be subject to a "double tax."[72]

I will deny the request for entry of judgment in the amount of penalty without prejudice. The Government may file another motion for default judgment which addresses the calculation of the tax penalty itself.

## V. CONCLUSION

For the foregoing reasons, I will grant the Government's motion for entry of default judgment on the issue of liability. I will deny the Government's motion regarding

---

[72] This argument has not been addressed by many courts. It may have some merit. See In re MDL-731 Tax Refund Litigation of Organizers and Promoters of Investment Plans Involving Book Properties Leasing Barrister Associates, et al., 989 F.2d 1290, 1304-05 (2d Cir. 1993)(affirming lower court's decision that penalty imposed on both partners and the partnership itself constituted a "double tax"); In re Tax Refund Litigation, 766 F.Supp. 1248 (E.D. N.Y. 1991). Penn-Mont was created as a separate legal entity by Mr. Koresko. Presumably, if it were a separate promoter, it could have separate liability. However, if it is simply an alter-ego for Mr. Koresko, separate liability may be a "double tax." Given that the facts could be read two different ways, I am hesitant to enter judgment in the Government's favor regarding the amount of penalty owed without more information. See Joe Hand Promotions, Inc. v. Yakubets, 3 F.Supp.3d 261, 266 (E.D. Pa. 2014)("An unopposed motion for default judgment can be a tempting invitation to defer automatically to, or at least consider more charitably, the plaintiff's view of the law in addition to his allegations of fact.... If, by contrast, the district court accepts the plaintiff's invitation and grants its imprimatur to the plaintiff's unchallenged legal *theory*, the court risks making bad law, even though that law is only persuasive authority, and even though the court is 'confined from molar to molecular motions.'" (quoting S. Pac. Co. v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting))); U.S. v. Buskell, No. 13-6630, 2014 WL 1765386, at *2 (E.D. Pa. May 2, 2014).

the amount of the tax penalty owed by Penn-Mont without prejudice. The Government may file another motion addressing the calculation of damages.

    An appropriate Order follows.